# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

CHRISTOPHER A. CUMMINS,      )
                                        )
        Petitioner,           )
                                        )   **NO. 1:16-cv-00023**
v.                                  )   **CHIEF JUDGE CRENSHAW**
                                        )
SHAUN PHILLIPS, Warden      )
                                        )
        Respondent.         )

## MEMORANDUM OPINION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner Christopher A. Cummins is serving a life sentence imposed by the Wayne County Criminal Court on May 26, 2011, after a jury convicted him of first-degree murder. (Doc. No. 1 at Page ID# 1.) Respondent has filed an answer to the petition (Doc. No. 15) stating that the grounds should be denied because they are without merit.

The matter is ripe for review and the court has jurisdiction. 28 U.S.C. § 2241(d). Respondent does not dispute that Petitioner's federal habeas petition is timely. (Doc. No. 15 at Page ID## 2261-62.) Respondent states that the federal habeas petition at issue here appears to be Petitioner's first application for federal habeas relief. (Id.)

Because a federal court must presume the correctness of a state court's factual findings unless the petitioner rebuts this presumption with 'clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and because the issues presented can be resolved with reference to the state-court record, the court finds that an evidentiary hearing is not necessary. See Schriro v. Landrigan, 550 U.S. 464, 474 (2007) (holding that if the record refutes a petitioner's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing

(citing <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998))).  Upon review and applying the AEDPA standards, the Court finds that Petitioner is not entitled to relief on the grounds asserted. Accordingly, the petition will be denied and this matter dismissed.

## I.    PROCEDURAL BACKGROUND

The state prosecution arose from the murder of Buddy Allen Griggs, the Petitioner's wife, Krystal Cummins's,[1] ex-boyfriend and the father of her two children.  On June 18, 2010, Petitioner was indicted by the Wayne County Grand Jury and charged with one count of first-degree murder.  (Doc. No. 14-1 at Page ID## 80-82.)  Petitioner was tried before a jury beginning on May 23, 2011 and ending on May 26, 2011, at which time the jury returned a verdict finding Petitioner guilty as charged.  (<u>Id.</u> at Page ID## 130-31); <u>see also</u> Doc. No. 14-2-14-7.)  Petitioner was sentenced to life imprisonment.  (Doc No. 14-1 at Page ID# 132.)

Petitioner appealed his judgment of conviction to the Tennessee Court of Criminal Appeals ("TCCA"), which rejected all appellate arguments, and affirmed Petitioner's conviction and sentence in an unpublished opinion issued on October 22, 2012.  (Doc. No. 14-12; <u>see also</u> <u>State v. Chris Cummins</u>, No. M2011-02264-CCA-R3-CD; 2012 WL 5193393, at *1 (Tenn. Crim. App. Oct. 22, 2012) [<u>Cummins I</u>].)  Petitioner filed an application for permission to appeal to the Tennessee Supreme Court, which was denied on March 5, 2013. (Doc. No. 14-14; <u>see also</u> <u>Washington I</u>, 2012 WL 6115589 at *1.)[2]

---

[1] Ms. Cummins name is sometimes spelled with a "C" and sometimes with a "K" throughout these proceedings.  The Court adopts the spelling used by TCCA—Krystal—in this Memorandum Opinion.

[2] In Tennessee, review by the state Supreme Court is not required for exhaustion.  Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" <u>Adams v. Holland</u>, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

On September 25, 2013, Petitioner timely filed a petition for post-conviction relief in the Wayne County Criminal Court. (Doc. No. 14-15 at Page ID## 1139-1189.) On September 9, 2013, the trial court appointed counsel. (Id. at Page ID## 1192-93.) Counsel did not file an amended petition for post-conviction relief, relying instead on Petitioner's *pro se* petition. (Doc. No. 14-16 at Page ID# 1212.) The matter was heard in the trial court on May 15, 2014, and on May 22, 2014, the court issued an order denying relief. (Doc. No. 14-15 at Page ID## 1200-04.)

Petitioner appealed to the TCCA, which denied relief on September 22, 2016. (Doc. No. 14-25; see also Christopher Allen Cummins v. State, No. M2014-01197-CCA-R3-PC, 2015 WL 4126737, at *1 (Tenn. Crim. App. July 9, 2015) [Cummins II].) Petitioner filed an application for permission to the appeal to the Tennessee Supreme Court, which was denied on November 24, 2015. (Id.)

## II.   STATEMENT OF FACTS

The TCCA summarized the facts presented at trial as follows:

> The victim, Buddy Griggs, was the ex-boyfriend of the defendant's wife, Krystal Cummins. The victim and Ms. Cummins had two young children together. The victim disappeared from his mother's home on April 17, 2010, and his remains were found approximately one month later, after the historic flood of May 2010, in a wooded area. Although both the defendant and Ms. Cummins initially denied any involvement with the victim's death, Ms. Cummins, after giving numerous contradictory statements to the police, implicated the defendant and led police to the victim's remains.
>
> Ms. Cummins testified at trial that the defendant was jealous of her relationship with the victim. According to Ms. Cummins, she had decided to leave the defendant because he manufactured methamphetamine. Ms. Cummins testified she brought the victim to the house where she and the defendant lived because she needed to retrieve her diaper bag prior to leaving the defendant. She unexpectedly found the defendant at home. Ms. Cummins testified that there was no immediate hostility between the victim and the defendant and that the three adults spent time playing with the children. According to Ms. Cummins, the victim had put his two-year-old daughter on the hood of a van and was engaged in making sure she did not

3

fall off when the defendant unexpectedly struck him from behind on the right side of the head with a sleeve cut from a thermal shirt, filled with rocks, and secured at either end. Ms. Cummins testified that the defendant then choked the victim with a wire cut from an exercise machine and fitted with homemade handles which she had noticed in his pocket earlier. The defendant wrapped the victim in plastic and placed him in the trunk of the car. The defendant and Ms. Cummins then drove the car with the children inside to the victim's mother's house and left the children there. Ms. Cummins also testified that they stopped by a gas station. After driving various places in an attempt to hide the body and making a few more stops, the defendant rolled the victim down a ridge. The defendant then burned various items which might have had physical evidence on them.

The defendant gave a statement in which he denied any knowledge of the victim's death. However, after he was informed that Ms. Cummins, in one of her statements, had told the police that he and the victim had been fighting and he killed the victim, the defendant gave a second statement which blamed Ms. Cummins for the victim's death. In this statement, he asserted that Ms. Cummins had told him the victim attempted to rape her and she hit him with a rock and choked him with some wire, then put him in the trunk of the car. The defendant stated that Ms. Cummins removed the body from the trunk at their home and wanted to burn the body, but he would not let her. He stated that she put the victim's body back in the trunk and left briefly and that he thought she had removed the body from the trunk. They then took the children to the victim's mother's house, went by the gas station, and drove various places. He stated that he did not realize the victim was still in the car until Ms. Cummins expressed a desire to go down a road to dump the body. When they got home, they burned some wood, but he would not let her burn the body at their home. He stated that he did not know when the body was removed from the trunk and that Ms. Cummins had burned several items.

On the Friday afternoon prior to trial, the prosecutor was told that an inmate had some information regarding the defendant's case. The prosecutor interviewed the inmate, then communicated with others in the District Attorney General's office. The prosecutor was not able to "fully interview" the witness until the morning of the first day of trial, and the decision was made then to use the inmate's testimony at trial. Although the inmate testified at trial that he had told the administrator of the jail that he knew something about the defendant's case in January, approximately four months prior to the trial in late May, the prosecutor stated to the trial court that, while he was aware that the inmate had information regarding a different case, he was not aware that the inmate had any information regarding the defendant's case until the Friday before trial.

The defendant moved for a continuance. At this time, the prosecutor revealed the substance of the witness's expected testimony. The trial court denied the continuance but allowed defense counsel to interview the inmate; the inmate refused to speak with defense counsel. The prosecution provided defense counsel with the inmate's criminal record for the purpose of impeachment. The inmate testified at trial that the defendant had told him and Steven Beersdorf—who was also incarcerated and who was trying to silence a prisoner who planned to testify against him—that the defendant had killed before and was not scared to do it again. The inmate testified that the defendant then privately told him that he had killed the victim with a sock full of rocks and strangled him with a wire, and that he did it so that the victim would not take the kids away because the kids "would get checks" until they turned eighteen. The defendant later, according to the inmate, showed him the photographs of the victim's remains and pointed out a fracture that he said was caused by hitting the victim with the rocks. On cross-examination, the inmate testified that at one point the defendant had animosity towards him because the inmate had called a guard to assist another prisoner who had a seizure while the defendant and another man were "smacking" him for being a child molester. According to the inmate, the defendant showed him the pictures of the victim's remains in order to frighten him. Jeremy Holt testified on behalf of the defendant that he had been incarcerated with the inmate witness and that the inmate told him that someone wanted the inmate to testify against the defendant. Mr. Holt testified that the inmate was trying to get information about the case against the defendant. The trial court allowed defense counsel to interview Mr. Beersdorf, who was allegedly present when the defendant confessed to having killed someone. Although the record shows that the defendant called Mr. Beersdorf and that Mr. Beersdorf testified, the record is missing the volume in which Mr. Beersdorf's testimony is recorded.

Numerous witnesses testified for the State and the defendant. A videotape from Ms. Cummins's stop at the gas station showed the defendant using the windshield cleaner to clean the bumper of the car, and medical testimony established that the victim's skeletal remains had sustained some trauma to the right side of the head which likely was not the result of scavenger activity. The victim's blood was found in the trunk of the car the defendant and Ms. Cummins had used that day. The defendant had attended church the following day and broke down crying at church. The State put on proof that the defendant had cut the victim's picture out of a photo album, and Ms. Cummins's mother testified that the defendant wouldn't let her speak with Ms. Cummins unless she was on speaker phone and that she had seen Ms. Cummins with bruises. The defense put on proof that Ms. Cummins had, in a conversation with an inmate who was housed with her in prison, confessed to killing someone and that she told the victim's aunt by telephone that she had killed the victim. The defense proof also included

evidence that Ms. Cummins had choked a woman with whom she was fighting and that she had thrown a boiling teapot at the victim's head. The jury convicted the defendant of first degree murder.

Cummins I, 2012 WL 5193393, at *1–3.

The TCCA summarized the evidence presented at the post-conviction evidentiary hearing, as follows:

> The petitioner testified at the hearing that he and his appointed counsel did not learn about Mr. Smith until the morning of the trial, despite the fact that the prosecutor had learned of his existence the previous Friday. The petitioner believed that, had the prosecutor informed them of the witness when he first learned of him, trial counsel would have had time to investigate Mr. Smith's background and proposed testimony. For instance, had trial counsel known earlier of Mr. Smith's claim that the petitioner had shown him photographs of the victim's body, counsel could have presented evidence to show that the petitioner was not provided any photographs of the victim in discovery and had no photographs in his possession.

> The petitioner complained that trial counsel not only failed to object to the prosecutor's statement in opening that the petitioner was "cooking meth," but also himself made a similar prejudicial comment in his closing argument. He further complained about counsel's having raised only a single issue on direct appeal and not having ensured that the entire record of the trial was included in the record on appeal. The petitioner said he believed that all four of the issues counsel raised in the motion for new trial should have been raised in the direct appeal.

> On cross-examination, the petitioner acknowledged that trial counsel was provided with Mr. Smith's criminal history and was given the opportunity to interview Mr. Smith. He further acknowledged that the jury heard Mr. Beersdorf's testimony, which contradicted Mr. Smith's testimony about the petitioner's alleged confession to the crime. On redirect examination, he recalled that trial counsel met with him only three times prior to trial. According to his testimony, trial counsel promised to meet with him on the Saturday and Sunday immediately prior to trial to review the case and to prepare him to testify, but trial counsel "never showed up."

> On recross examination, the petitioner testified that he wanted to testify at trial but, because trial counsel never prepared his testimony and told him that counsel's wife thought he should not testify, he agreed not to take the stand. The petitioner acknowledged, however, that he did not allege in his petition that trial counsel had forced him not to testify. He further

acknowledged that he had thirty-four felony forgery convictions, which the State could have used to impeach his testimony.

Trial counsel, called as a witness by the State, testified that the petitioner's use and production of methamphetamine was an issue that was "so intertwined" in the facts of the case that he did not "see any way that that could be taken out." As for his having raised only the single issue on appeal, trial counsel explained that he thought the trial judge had ruled in the defense's favor on a lot of the issues throughout trial, thus "limiting what [they] could do on appeal just because those issues weren't there." Counsel said he did not believe, given the evidence, that he could have raised a sufficiency of the evidence issue with a "straight face." Counsel stated that his investigator found witnesses who were able to testify that the petitioner's wife had confessed to the murder.

Trial counsel testified that he met with the petitioner "quite a bit, especially . . . when [they] were getting ready for . . . trial." He discussed with the petitioner the possibility of his testifying, including the fact that he had thirty-four felony forgery convictions and had given two different stories to the police about the crime. Trial counsel said the petitioner was "[a]ll for not testifying" at the conclusion of their discussions. At one point during trial, the petitioner mentioned a desire to testify, but he changed his mind after another discussion with counsel in which counsel again advised him not to testify. Counsel recalled that he probably discussed the issue with his wife, who had witnessed a good portion of the trial, and also probably conveyed to the petitioner his wife's opinion that the petitioner should not testify. He said, however, that whether or not to testify was ultimately the petitioner's decision.

Trial counsel testified that he objected to the last minute jailhouse witness and moved for a continuance, which was denied. He said that Mr. Smith was a devastating witness and that the more he cross-examined him, "the worse it got." He was given Mr. Smith's criminal record and afforded an opportunity to talk to him before trial, but Mr. Smith declined to speak with him.

Trial counsel testified that he issued a subpoena for Jamie Staggs, who had, supposedly, seen the petitioner turn "white as a sheet" when Mr. Staggs asked him about the victim. Counsel said he had no knowledge of Mr. Staggs having confessed to the murder, and if he had had that information, he could have put him on the stand and questioned him about it. Trial counsel testified that he provided discovery to the petitioner, which would have included copies of the photographs in the case.

On cross-examination, trial counsel testified that the prosecutor told him during a telephone conversation on the Sunday before trial that he might have a surprise for him at trial. He said he told the prosecutor that he hated surprises and asked him to let him know what it was, but the prosecutor chose not to reveal the nature of the surprise, or the name of the witness, until the morning of trial. He agreed that had he known about the witness a month before trial, he could have thoroughly investigated his background and tried to talk to him about his testimony. Trial counsel said he knew he prepared for the trial over the weekend, but he could not recall if he visited the petitioner in the jail on that Saturday or Sunday. Finally, trial counsel testified that, in his opinion, arguing against the sufficiency of the evidence on direct appeal would have been "frivolous" given the amount of evidence against the petitioner.

The petitioner testified in rebuttal that the only photograph he ever received was one of an automobile; he never had any photographs of the victim's body or remains in his possession.

On May 22, 2014, the post-conviction court entered an order denying the petition, finding that the petitioner's claim of prosecutorial misconduct based on the late disclosure of the witness was an issue that had already been litigated on direct appeal and that the petitioner failed to show either a deficiency in counsel's performance or a resulting prejudice to his case.

Cummins II, 2015 WL 4126737, at *3–4.

## III.   ISSUES PRESENTED FOR REVIEW

In his *pro se* petition, Petitioner raises the following claims:

1.   His right to due process was violated when:

   a.   The trial court refused to grant a continuance

   b.   The prosecutor deliberately concealed a material witness until the day of trial

   c.   The prosecutor deliberately admitted evidence regarding Petitioner's prior bad acts

2.   Ineffective assistance of trial counsel for:

   a.   failing to object to admission of prior bad acts evidence against Petitioner

   b.   improperly influencing Petitioner not to testify

> c. not calling a witness from jail to contradict Brian's Smith's testimony that Petitioner showed him photographs of the victim's body

(Doc. No. 1; Doc. No. 35.)

## IV.    <u>STANDARD OF REVIEW</u>

This matter is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). <u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." <u>Bell v. Cone</u>, 543 U.S. 447, 455 (2005) (citations omitted); <u>see</u> <u>Hardy v. Cross</u>, 565 U.S. 65, 66 (2011); <u>Felkner v. Jackson</u>, 562 U.S. 594, 597 (2011). "AEDPA requires heightened respect for state court factual and legal determinations." <u>Lundgren v. Mitchell</u>, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); <u>see</u> <u>Premo v. Moore</u>, 562 U.S. 115, 121 (2011); <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190 (2009). AEDPA prevents federal habeas "retrials" and "ensure[s] that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Parker v. Matthews</u>, 567 U.S. 37, 38 (2012).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000); <u>Bailey v.</u>

Mitchell, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, this court may not rely on the decisions of lower federal courts. Lopez v. Smith, 135 S. Ct.1, 4 (2014); Harris v. Stovall, 212 F.3d 940, 943-44 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. Greene v. Fisher, 565 U.S. 34, 39 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. Miller v. Stovall, 742 F.3d 642, 644-45 (6th Cir. 2014) (citing Greene, 565 U.S. at 38).

The AEDPA standard is difficult to meet "because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011); see Burt v. Titlow, 134 S. Ct. 10, 16 (2013); Metrish v. Lancaster, 569 U.S. 351, 357-58 (2013); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). Indeed, "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." Harrington, 562 U.S. at 102-03 (citation and internal quotation omitted); see Woods v. Donald, 135 S. Ct. 1372, 1376 (2015).

Under AEDPA, 28 U.S.C. § 2254(d):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Ayala, 135 S. Ct. at 2198; see also White v. Wheeler, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.') (internal citation omitted).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court cases, or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. Bell, 535 U.S. at 694 (citing Williams, 529 U.S. at 405-06). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from United States Supreme Court decisions but unreasonably applies it to the facts of the particular case. Id. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411; accord Bell, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." Williams, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 134 S. Ct. 1697, 1706-07 (2014) (quoting Harrington, 562 U.S. at 103).

## V.   DISCUSSION

### A.  Due Process Violations

#### 1.   The trial court refused to grant a continuance

Petitioner claims that the trial court violated his right to a fair trial when it denied his request for a continuance after the prosecutor revealed on the morning of trial that he intended to call as a witness Brian Smith, an inmate who had been housed with Petitioner.  Respondent argues that Petitioner is not entitled to relief on this claim.

The TCCA considered this claim on direct appeal:

> The defendant contends that he is entitled to a new trial because the trial court erred in denying his request for a continuance.  The denial of a continuance falls within the discretion of the trial court, and the trial court's decision will not be overturned absent a clear showing of abuse of discretion to the prejudice of the defendant.   State v. Wilson, 164 S.W.3d 355, 362 (Tenn.Crim.App. 2003).  Tennessee Code Annotated section 40–17–106 states:
>
> > It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the indictment or presentment is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause, and sign each indictment or presentment name thereto.
>
> The prosecution's failure to include a witness in the indictment does not automatically entitle a defendant to relief, however.  This statute is merely directory, and a witness whose name is omitted from the indictment is not necessarily disqualified from testifying, State v. Hutchison, 898 S.W.2d 161, 170 (Tenn. 1994).  The purpose of the statute is to prevent the defense from being surprised by evidence at trial.  State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn.Crim.App. 2000).  The defendant is therefore not entitled to relief unless he can demonstrate prejudice.  Hutchison, 898 S.W.2d at 170.  The relevant prejudice is not that resulting from the testimony offered at trial but any prejudice that results from the defendant's lack of notice regarding the witness's appearance. Wilson, 164 S.W.3d at 362.
>
> The defendant contends that he was prejudiced by his inability to investigate (1) the inmate's familiarity with the case, including any interaction with friends of the victim who could have informed the inmate about the details of the case; (2) biases the inmate may have had against the defendant; (3) the inmate's reputation

for truthfulness in his community; (4) whether the inmate, Mr. Beersdorf, and the defendant were actually housed together at the time of the alleged conversation; and (5) an "infinite number of leads" derived from the above investigations. He also argues that he was unable to effectively cross-examine the witness. Prejudice is usually established at a proceeding subsequent to trial. <u>State v. Morris</u>, 750 S.W.2d 746, 749 (Tenn.Crim.App. 1987). The defendant's assertions that he was prejudiced by inadequate time to investigate the inmate's claims are speculative and conclusory. The defendant has failed to make any concrete showing of prejudice. The inmate refused to speak with defense counsel, and there is no reason to think delay would have changed his mind. The defense has pointed to no evidence which could have been used to undermine the inmate's testimony had it come to light prior to trial. In this case, there was "no showing in post-trial proceedings that had the defendant had more time he could have impeached or refuted the testimony of the witness[ ]." <u>State v. Underwood</u>, 669 S.W.2d 700, 703 (Tenn.Crim.App. 1984).

* * *

The prosecution provided the defense with the witness's criminal history to aid in cross-examination, and the witness was thoroughly cross-examined. The trial court extended the trial for an extra day in order to allow the defense to call Mr. Beersdorf to testify. The defendant also used the testimony of Mr. Holt to impeach the inmate's claims that the defendant had confessed. In similar circumstances, we have held that the trial court did not abuse its discretion in denying a continuance. <u>See</u> <u>Hutchison</u>, 898 S.W.2d at 170–171 (finding no prejudice when the defendant was notified of previously unavailable witness on first day of trial, the State provided the defendant with the witness's criminal record, and defense counsel interviewed and cross-examined the witness); <u>Harris</u>, 839 S.W.2d 69 (denying relief where the witness came to light four days prior to trial, the defendant was notified, and the defendant had the opportunity to cross-examine the witness and to discredit the witness by calling the witness's mother to testify); <u>Kilpatrick</u>, 52 S.W.3d at 87 (denying relief because "nothing would have been gained by the defense had the trial been continued to a later date" and because defendant should have known witnesses would testify regarding the chain of custody); <u>State v. Gilbert</u>, 612 S.W.2d 188, 191 (Tenn.Crim.App. 1980) (holding that a witness was properly allowed to testify although the prosecution only discovered the witness on the morning of trial, when the testimony was duplicative and when there was no indication that the witness's testimony "would have been different if defense counsel had been permitted to interview him earlier"). We conclude that the trial court did not err.

<u>Cummins</u>, 2012 WL 5193393, at *3–4; <u>see</u> <u>also</u> Doc. No. 14-12 at Page ID# 1122-23.

13

Deciding whether to grant a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). However, in criminal proceedings, a trial court's denial of a continuance can rise to the level of a due process violation when there is an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. See Burton v. Renico, 391 F.3d 764, 772 (6th Cir. 2004). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." Ungar, 376 U.S. at 589. Whether the denial of a continuance violates due process depends upon "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id. Additionally, to obtain habeas relief, a petitioner must demonstrate that the denial of his request for a continuance resulted in actual prejudice to his defense. Burton, 391 F.3d at 772; see also Powell v. Collins, 332 F.3d 376, 396 (6th Cir. 2003). A petitioner demonstrates actual prejudice by showing that additional time would have benefitted the defense. Powell, 332 F.3d at 396.

Petitioner has failed to establish actual prejudice in that he has not demonstrated how a continuance would have benefited his defense. On the morning of trial, when the prosecutor explained to the trial court that he planned to call Mr. Smith as a witness, the prosecutor also disclosed the substance of what Mr. Smith was expected to testify about. (Doc. No. 14-2 at Page ID## 187-200 (explaining that Mr. Smith was expected to testify about a conversation that took place between him, Petitioner and Steven Beersdorf, who was incarcerated with Petitioner and Mr. Smith, regarding Mr. Beersdorf's desire to do harm to another inmate who was expected to testify against Mr. Beersdorf and that Mr. Smith was expected to testify that he heard Petitioner

say "I can kill somebody. I've done it before." Additionally, Mr. Smith was expected to testify about a conversation that he alone had with Petitioner in which Petitioner gave details about how he killed the victim.) As such, Petitioner's trial counsel was given a lot of information about Mr. Smith's testimony; information that the prosecutor would not normally have to reveal prior to trial. (See Doc. No. 14-2 at Page ID# 194 (noting that while the prosecutor is required to reveal exculpatory evidence, none of the information Mr. Smith had was exculpatory. Additionally, noting that although the prosecutor is not required to disclose the substance of Mr. Smith's testimony, he was doing so to be fair to the defense); see also Doc. No. 14-7 at Page ID# 765-67, 771.)

In the interest of fairness, the trial court issued an order directing the Tennessee Department of Corrections (TDOC) to transport Mr. Beersdorf to the courthouse so that trial counsel could interview him, and so that he could testify at trial. (Doc. Nos. 14-2 at Page ID# 195; Doc. No. 14-9 at Page ID#1050.) The trial court also directed the prosecutor to assist Petitioner's trial counsel in obtaining Mr. Smith's criminal record, which the prosecutor did, so that Petitioner's counsel could cross-examine Mr. Smith. (Doc. No. 14-2 at Page ID## 195, 198.) At trial, Petitioner's trial counsel effectively cross-examined Mr. Smith. Under trial counsel's questioning, Mr. Smith conceded that he was incarcerated for forgery, a crime of dishonesty, that Petitioner "got upset" with him because Mr. Smith called prison guards to intervene in an incident involving Petitioner and several other inmates and that since the time of this incident Petitioner had "animosity" toward Mr. Smith. (Id. at Page ID## 672, 674-76.)

Additionally, the trial court extended the trial by one day to allow Petitioner to obtain Mr. Beersdorf's testimony. (Doc. No. 14-7 at Page ID# 861-62.) Ultimately, not only did Mr.

Beersdorf testify during the defense case,[3] but Jeremy Holt, a man who had been incarcerated with Mr. Smith also testified. (Doc. No. 14-7 at Page ID# 844-854.) Although Mr. Beersdorf's testimony remains a mystery, Mr. Holt testified that Mr. Smith asked Mr. Holt if he knew Petitioner and told him that "they was [sic] trying to get [Mr. Smith] to testify against [Petitioner], but . . . [Mr. Smith] didn't know anything about [Petitioner's case] and [Mr. Smith] asked [Mr. Holt] if [he] did." (Id. at Page ID# 845.)

Petitioner has not specifically identified any investigation he wanted to, but could not do because the trial court denied his request for a continuance. However, in the TCCA, Petitioner raised five areas of investigation he could have pursued if he had been given a continuance: (1) Mr. Smith's familiarity with the case; (2) any biases Mr. Smith had against Petitioner; (3) Mr. Smith's reputation for truthfulness; (4) whether Mr. Smith and Mr. Beersdorf were actually housed together; and (5) "an infinite number of leads" derived from the above investigations. See Cummins I, 2012 WL 5193393. The TCCA found these assertions to be "speculative and conclusory" and found that Petitioner failed to show that he had been prejudiced. Id.

Even if Petitioner had raised these issues here, he would fare no better. The alleged areas of investigation Petitioner identifies could have or were explored via cross-examination. For example, the best source of information for how much Mr. Smith knew about the Petitioner's case was Mr. Smith himself, and Petitioner's trial counsel vigorously questioned Mr. Smith about what he knew. See Doc. No. 14-5 at Page ID## 674, 676 (trial counsel questioning Mr. Smith about what Petitioner told him about the case when Petitioner allegedly showed Mr. Smith pictures of the victim); Id. at Page ID## 674, 677 (trial counsel questioning Mr. Smith about why

---

[3] Unfortunately, the transcript containing Mr. Beersdorf's testimony was not made part of the record before the TCCA and is not part of the record here. See Cummins I, 2012 WL 5193393, at * 2

Petitioner chose to discuss his case with Mr. Smith)). Petitioner does not suggest what additional information he could have obtained or how he would have obtained it if the case had been continued. Petitioner claims that if given more time he would have tested Mr. Smith's bias against Petitioner, but counsel did test Mr. Smith for bias on cross-examination when he questioned Mr. Smith about the "animosity" between Petitioner and Mr. Smith. (See id. at Page ID## 674-77.) Again, Petitioner fails to suggest what additional information he needed or how he would have obtained such information. Petitioner claims that he would have tested Mr. Smith's reputation for truthfulness if the trial had been continued. Petitioner's counsel did test Mr. Smith's reputation for truthfulness by obtaining the testimony of Jeremy Holt who testified that Mr. Smith knew nothing about Petitioner's case. (See Doc. No. 14-7 at Page ID# 845.) Petitioner would have investigated whether Mr. Smith and Mr. Beersdorf were actually housed together, but Petitioner's counsel had both men on the witness stand and counsel clearly questioned Mr. Smith regarding the details of his housing situation. (Id. at Page ID# 673, 677-78.) Finally, Petitioner claims each of these investigations would have opened up avenues for additional investigation, yet he fails to even suggest what he believes might have been found and how it would have benefitted his case.

Based on the foregoing, Petitioner has failed to demonstrate that a continuance would have benefitted his case. As such, he cannot establish that he was prejudiced by the trial court's decision to deny a continuance. Petitioner is not entitled to relief on this claim.

## 2. The prosecutor deliberately concealed a material witness until the day of trial

Petitioner claims that the prosecutor violated his right to due process when he intentionally concealed a material witness until the day of trial. Respondent argues that this claim is without merit.

The TCCA considered this claim in connection with Petitioner's post-conviction appeal:

> The petitioner argues that he is entitled to a new trial because the prosecutor deliberately concealed a material witness until the morning of trial, violating his due process rights to a fair trial and prejudicing his defense. The post-conviction court made the following findings of facts and conclusions of law with respect to this claim:
>
>> Petitioner claims the prosecution failed to timely disclose as a witness an inmate who had been in jail with Petitioner. This same issue was raised on appeal in the context of the Trial Court erring by failing to grant a continuance because the witness was not disclosed to Petitioner until the morning of the first day of the trial. The Court of Criminal Appeals fully addressed the State's last minute disclosure of the witness, the reasons for the State not disclosing the witness earlier, the steps taken by the Court to minimize any prejudice to the defense, and whether the Court erred in refusing to grant a continuance. The Court of Criminal Appeals found no reversible error and affirmed the Trial Court. Petitioner's ground for relief related to prosecutorial misconduct is without merit because the matter was previously determined by [the] Court of Criminal Appeals.
>
> We agree with the post-conviction court that the petitioner's "prosecutorial misconduct" claim was determined by this court on direct appeal when we addressed whether the trial court erred by denying the motion for a continuance. Accordingly, we conclude that the petitioner is not entitled to post-conviction relief on the basis of this claim.

Cummins II, 2015 WL 4126737, at *6. With respect to the prosecutor's behavior in revealing that Mr. Smith would be added to the State's witness list on the morning of trial, the TCCA stated:

> [T]he defendant has shown "[n]o prejudice, bad faith, or undue advantage" on the part of the State. State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992). Although the

inmate testified that he had informed an administrator at the prison regarding his testimony approximately four months before the trial, it appears that the prosecution was not actually aware of the inmate's claims until the Friday before trial, and the prosecution did not have the opportunity to fully interview him and evaluate his potential as a witness until the day of trial, when it promptly informed the defendant that the witness would be called. The defendant has not shown that the State acted in bad faith or obtained an undue advantage. See Underwood, 669 S.W.2d at 703 ("Although an officer apparently had known of these witnesses for a considerable length of time, for various reasons, the district attorney general had not.").

As explained above on the morning of trial, the prosecutor revealed for the first time that he intended to call Mr. Smith as a witness. In addition to setting forth the substances of Mr. Smith's testimony, the prosecutor also explained when and how he first learned about the existence of Mr. Smith and his potential usefulness as a witness at trial. The prosecutor explained that:

> I was called late Friday afternoon. It must have been after four o'clock, and told that an inmate by the name of Brian Smith wished to talk to Chief Gerald Baer, concerning Mr. Cummins' case.
>
> I asked Mr. Baer to get him out. He talked with him, called me back. I went to the jail. Talked with Inmate Smith and Inmate Smith, basically, related that he had overheard at least one and maybe two conversations in which Mr. Cummins was bragging about this murder and -- and giving some detail, not generally known to the public, about the murder.
>
> Mr. Smith is serving a violation of probation. He lacks about a month having his sentence expired. No -- no deal is in place with Mr. Smith by any state, form, or fashion, other than he asked not to be housed with the Defendant, if he was going to testify against him.
>
> Given the lateness of the hour, I had to communicate this with General Cooper and with some others in my office, and decide whether we wanted to even try to use that, at this point.
>
> There was certainly nothing Brady that he -- that he told me about, that would have been exculpatory, that I would have had to have turned over, Judge.
>
> This morning, logistically, was the first morning we could really sit down and have a serious discussion with Mr. Smith, Inmate Smith.

And we have now decided that, yes, we would like to use him.

As soon as that decision was made, probably at ten o'clock this morning, I made Mr. Butler aware that I was adding him to the witness list.

Now, I understand Mr. Butler now wants a continuance because of that. The only -- the only other thing I would tell the Court in complete, absolute candor is that Inmate Smith, about two months ago, related to members at the jail, apparently, that he had overheard one of these conversations in which Mr. Cummins was a participant, along with some others about the Beersdorf case.

And Your Honor may or may not be familiar with that.

But that there was an inmate at the jail that was going to be a witness for the State in the Beersdorf case. And there was a discussion had concerning ways that they might get him not to testify.

And that information was related to me by law enforcement personnel, but it was it was -- it was concerning the Beersdorf case.

It wasn't concerning this case.

I don't know. I don't have any idea -- I did not get any information concerning statements made by the Defendant in this case. And I didn't make any notes about it and I have zero recollection.

So even though this reared its head in connection with the Beersdorf case, several months ago, in absolute candor, it was nothing that was made known to the State concerning Chris Cummins or what Chris Cummins would say.

(Doc. No. 14-2 at Page ID## 187-90.) The prosecutor reiterated and emphasized that nothing Mr. Smith had to say was exculpatory and that the prosecutor had no obligation under state law other than to place Mr. Smith on his witness list within a certain time-period, which the prosecutor conceded was unavoidably violated. (See Id. at Page ID## 194, 200.)

Under Brady v. Maryland, 373 U.S. 83 (1963) "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court has held that "[t]here are three components of a true Brady

violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 281 (quoting Bagley, 473 U.S. at 682); see also Cone v. Bell, 556 U.S. 449, 469-73. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682.

There is no reasonable basis from which to argue that Mr. Smith's testimony was exculpatory, it was anything but that, and Petitioner does not try. Thus, Petitioner cannot establish a Brady violation. Even if Mr. Smith's testimony were exculpatory, the Petitioner still could not establish a Brady violation because, as thoroughly explained above, he cannot establish that he was prejudiced by the late disclosure of Mr. Smith. Moreover, generally speaking, Brady does not apply to delayed disclosure, but only to a complete failure to disclose. See United States v. Davis, 306 F.3d 398, 421 (6th Cir.2002).

To the extent that Petitioner intends to argue that the prosecutor's failure to disclose that Mr. Smith would be called as a witness until the morning of trial violated a state or local rule of procedure, he is not entitled to habeas relief. "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" Wilson v. Corcoran, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" Blackledge v. Allison, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases). The federal courts have no power to

intervene on the basis of a perceived error of state law. <u>Wilson</u>, 131 S. Ct. at 14; <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005); <u>Estelle v. McGuire</u>, 502 U.S. 67-68 (1991).

Based on the foregoing, Petitioner is not entitled to relief on this claim.

### 3. The prosecutor deliberately and improperly admitted evidence regarding Petitioner's prior bad acts

In his reply to Respondent's answer to the petition, Petitioner appears to raise, for the first time, a claim that the prosecutor violated his due process rights by deliberately and improperly admitting evidence of Petitioner's prior bad acts.[4]  "[A] traverse or reply to an answer to a habeas petition is not the proper pleading for a habeas petitioner to raise additional grounds for relief. <u>Burns v. Lafler</u>, 328 F. Supp. 2d 711, 724 (E.D. Mich. 2004).  A [federal habeas] court cannot consider new issues raised in a traverse or reply to the State's answer." <u>Id.</u>

Moreover, even if the Court could consider a claim first raised in Petitioner's reply, this claim is procedurally defaulted.  See <u>Cone v. Bell</u>, 243 F.3d 961, 967 (6th Cir. 2001) <u>rev'd on other grounds</u>, 535 U.S. 635 (2002). (concluding that "[i]f the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred"); <u>see also Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991) (concluding that "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.")  In his reply, Petitioner recognizes that this claim is procedurally defaulted, but relying on <u>Martinez v. Ryan</u>, 132 S.Ct. 1309 (2012) and its progeny, argues that the ineffective assistance of his appellate and post-conviction counsel was the cause for the procedural default of this claim. Once again, Petitioner cannot raise this claim

---

[4] Respondent does not address this claim in his response.

for the first time in his reply, but even if he could he would not be entitled to relief. "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of *a claim of ineffective assistance at trial*. Id. at 1315 (emphasis added). The Sixth Circuit has strictly enforced the limitation on the scope of *Martinez*, explaining that "[w]e will assume that the Supreme Court meant exactly what it wrote." Hodges v. Colson, 727 F.3d 517, 531 (6th Cir. 2013) (holding that ineffective assistance of post-conviction counsel did not excuse default of substantive mental-competence claim or of ineffective-assistance-of-appellate-counsel claim).[5] The claim Petitioner raises in his reply is a claim for prosecutorial misconduct and not ineffective assistance of trial counsel. Thus, Martinez cannot save this claim. As such, the Court cannot, and does not, consider it.

### B. Ineffective Assistance of Counsel

Petitioner alleges that his trial counsel was ineffective for a number of reasons. In Strickland v. Washington, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-part test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be

---

[5] Very recently, the Supreme Court confirmed its hesitance to expand the scope of Martinez. See Davila v. Davis, 137 S.Ct. 2058, 2065 (2017) (stating the "[p]etitioner asks us to extend Martinez to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim. We decline to do so.")

considered sound trial strategy. Id. (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)); see also Nagi v. United States, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. Id. at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of Strickland under § 2254(d), the deferential standard of Strickland is "doubly" deferential. Harrington, 562 U.S. at 105 (citing Mirzayance, 556 U.S. at 123); see also Titlow, 134 S. Ct. at 13; Cullen, 563 U.S. at 189; Moore, 562 U.S. at 122. In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.; Jackson v. Houk, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a Strickland claim in the context of habeas and AEDPA . . . .") (citing Richter, 562 U.S. at 101-02).

Relying on the standard set forth in Strickland, the TCCA considered Petitioner's ineffective assistance of counsel claims as follows:

> The petitioner argues on appeal that counsel was ineffective for not objecting to evidence that the petitioner manufactured methamphetamine, for improperly influencing the petitioner not to testify, and for not calling a witness from the jail to contradict Brian Smith's testimony that the petitioner showed him a photograph of the victim's body. The record, however, supports the post-conviction court's findings that the petitioner failed to show either a deficiency in counsel's performance or prejudice to the petitioner's case. Trial counsel's testimony, which was accredited by the post-conviction court, established that counsel had several discussions with the petitioner about testifying and advised him of the

reasons he thought he should not testify, but left the ultimate decision to the petitioner. Trial counsel also explained that the methamphetamine evidence was so intertwined with the facts of the case that he saw no way to exclude it from the trial. As for counsel's failure to call a witness to contradict Brian Smith's testimony that the petitioner showed him a photograph of the victim, counsel was not even made aware of Mr. Smith's existence until the morning of trial. Furthermore, since Mr. Smith refused to talk to counsel, counsel had no way of knowing in any detail what the substance of his testimony would be. In sum, the petitioner has not met his burden of demonstrating that he was denied the effective assistance of counsel. Accordingly, we conclude that the petitioner is not entitled to post-conviction relief on the basis of this claim.

Cummins II, 2015 WL 4126737, at *5.

## 1. Trial Counsel was Ineffective for Failing to Object to the Admission of Prior Bad Acts Evidence

Petitioner claims that his trial counsel was ineffective for failing to object to the admission of prior bad acts evidence against Petitioner. Specifically, Petitioner argues that trial counsel should have objected to testimony at trial related to his alleged use and production of methamphetamine. Respondent argues that Petitioner is not entitled to relief on this claim.

There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence. In Estelle v. McGuire, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. Estelle, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. Id. at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, see Old Chief v. United States, 519 U.S. 172 (1997); Huddleston v. United States, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly

established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003).

Moreover, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." Estelle, 502 U.S. at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. Seymour v. Walker, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); accord Coleman v. Mitchell, 268 F.3d 417, 439 (6th Cir. 2001). Thus, this Court cannot inquire into the propriety of the state court's admission of other acts evidence.

Even if the Court could consider whether the prior bad acts evidence was improperly admitted, and thus, whether trial counsel was ineffective for failing to object to the admission of such evidence, Petitioner still would not be entitled to relief. First, trial counsel testified at the post-conviction hearing that he had filed a motion to prevent the prosecutor from "bringing up any prior bad acts or anything that [Petitioner] may have had in his past." (Id.; see also Doc. No. 14-1 at Page ID# 94 (Petitioner's request for hearing regarding the admissibility of prior bad acts and convictions.) The record does not disclose whether a hearing was ever held on this motion or what might have transpired during such a hearing, and neither party has endeavored to enlighten the Court. Nevertheless, Petitioner is not entitled to habeas relief on this claim because

the evidence was clearly admissible. Even if the evidence was not admissible and counsel failed to object, and such a failure amounted to deficient performance, Petitioner has not established prejudice.

"Evidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." Tenn. R. Evid. 404(b); State v. Parton, 694 S.W.2d 299, 654 (Tenn. 1997). "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." State v. McCary, 119 S.W.3d 226, 243 (Tenn.Crim.App. 2003) (citing State v. Adkisson, 899 S.W.2d 626 (Tenn.Crim.App.1994)). Yet, such evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme" or "contextual background." State v. Little, 402 S.W.3d 202, 210 (Tenn. 2013).

As the TCCA noted, Petitioner's counsel testified at the state post-conviction hearing that testimony regarding Petitioner's production and use of methamphetamine "was so intertwined in these facts that I really didn't see any way that that could be taken out." (Doc No. 14-16 at Page ID# 1292; see also Cummins II, 2015 WL 4126737, at *5. The state post-conviction court noted that there was testimony at trial that Petitioner's methamphetamine production and use was causing marital difficulties and that his wife, Krystal Cummins, had threated to leave him if he did not stop using and making methamphetamine. (Doc. No. 14-15 at Page ID# 1202.) Additionally, Ms. Cummins testified that she had asked the victim, who was also the father of Ms. Cummins two young children, to help her dispose of items that Petitioner used to make methamphetamine. (Id.) Ms. Cummins testified that a week before the victim was killed, she and the victim had taken and buried Petitioner's methamphetamine making supplies so that he

could not find them in an effort to stop him from using them, and that Petitioner was angry with her and the victim as a result. (Doc. No. 14-2 at Page ID# 284-88.) Ms. Cummins also testified that the victim was at her home on the day he was killed because he was helping her to leave Petitioner because he would not stop making and using methamphetamine. (Doc. No. 14-2 at Page ID# 290-293.)

Although it is unclear whether the trial court held the required hearing under 404(b),[6] there is ample reason to believe that if such a hearing was held, the trial court found the evidence admissible. At a minimum, Ms. Cummins' testimony about Petitioner's use and production of methamphetamine set the contextual background for the events that ultimately transpired. Ms. Cummins testimony explained why she wanted to leave Petitioner, why the Petitioner might have wanted to kill the victim and why the victim was present at the Cummins' home on the day that he was killed. Further, the TCCA concluded that Petitioner's counsel was not ineffective for failing to object to the admission of the testimony regarding methamphetamine.

Even if the Court were to assume that trial counsel was deficient for not objecting to the admission of the prior bad acts evidence, Petitioner has failed to establish prejudice. There was ample evidence at trial to establish that the Petitioner killed the victim. See Doc. No. 14-2 at Page ID## 293-305 (testimony of Krystal Cummins describing the murder); Doc. No. 14-4 at Page ID# 506 (testimony of Sergeant Cody Mayes with the Wayne County Sheriff's Department regarding blood in the trunk of Petitioner's car); Id. at Page ID## 541-43 (testimony of Diane

---

[6] To determine the admissibility of evidence under Tenn. R. Evid. 404(b), the trial court must (1) hold a hearing upon request outside the jury's presence; (2) determine that a material issue exists, other than conduct conforming with a character trait and upon request that on the record the material issue, the ruling and the reasons for admitting the evidence; and (3) exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Lay identifying Petitioner as the owner of the car in which the blood was found); Id. at Page ID## 544-550 (testimony of David Miller preacher and employee of the Indian Creek Baptist Association regarding Petitioner's break-down at Grace Baptist Church); Id. at Page ID## 584-634 (testimony of Investigator Kenneth Martin with the Wayne County Sheriff's Department regarding Krystal Cummins efforts to corroborate her statements to the police about how and why the victim was killed and the events that took place before and after the victim's death). Thus even if trial counsel was deficient for failing to keep the methamphetamine testimony out, Petitioner has not demonstrated how this evidence prejudiced his case. Petitioner is not entitled to relief on this claim.

## 2. Improperly Influencing Petitioner Not to Testify

Petitioner claims that his trial counsel improperly influenced him not to testify at trial. Respondent argues that this claim is without merit.

In United States v. Stover, 474 F.3d 904 (6th Cir. 2007), the Sixth Circuit stated:

Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993). . . . Barring any statements or action from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to *sua sponte* address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor insure that the defendant has waived the right on the record. Joelson, 7 F.3d at 177. See also United States v. Ortiz, 82 F.3d 1066, 1069 n. 8 (D.C. Cir. 1996) (noting the agreement of the First, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits that the trial court does not have a duty to *sua sponte* conduct an on-the-record colloquy regarding waiver)

A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. Joelson, 7 F.3d at 177. At base, a defendant must "alert the trial court" that he desires to testify or if there is a disagreement with defense counsel regarding whether he should take the stand. Pelzer [v. United States, 105 F.3d 659 (Table), 1997 WL 12125, at * 2 (6th Cir. Jan. 13, 1997) (unpublished)]. When a defendant does not alert the trial court of a disagreement, waiver of the

right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so. Joelson, 7 F.3d at 177.

Stover, 474 F.3d at 908-09 (quoting United States v. Webber, 208 F.3d 545, 551 (6th Cir. 2000)).

Prior to accepting Petitioner's waiver of his right to testify, the trial court conducted a Momon hearing[7] in which trial counsel engaged in a colloquy on the record, but outside the presence of the jury, with Petitioner to ensure that Petitioner's was knowingly and voluntarily waiving his right to testify. (See Doc. No. 14-7 at Page ID## 855-59.) At that hearing, in which the Petitioner was placed under oath, Petitioner conceded that he understood that he had a constitutionally protected right to testify, that he had discussed his right to testify with trial counsel, that he understood that he alone had the right to decide whether he testified and that he understood that the jury would be instructed not to consider his failure to testify for any purpose. (Doc. No. 14-7 at Page ID## 856-59.) The court took a lunch break before concluding the Momon hearing so that trial counsel and Petitioner could discuss one more time whether, in light of the evidence presented in the State's case in chief, Petitioner should testify. (Id. at Page ID# 859.) Upon returning to court and while still under oath, the trial court asked Petitioner whether he intended to testify and Petitioner responded, "I have decided not to testify." (Id.) The trial court further asked Petitioner whether he understood that he had a right to testify and whether he was deciding not to testify of his own free well, to which Petitioner responded, "Yes." (Id. at Page ID# 860.)

---

[7] In Momon v. State of Tennessee, 18 S.W. 3d 152 (Tenn. 2000) the Tennessee Supreme Court recognized that "the right of a criminal defendant to testify in his or her own behalf is a fundamental constitutional right." Id. at 161. Accordingly, the court held that, "the right may only be waived personally by the defendant." Id. Because the right to testify is both fundamental and personal, it "may only be waived if there is evidence in the record demonstrating 'an intentional relinquishment or abandonment of a known right or privilege.'" Id. at 162 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

Moreover, trial counsel testified at the post-conviction hearing that he met with Petitioner several times to discuss whether Petitioner should testify. (Doc. No. 14-16 at Page ID## 1308-09.) Trial counsel explained that he recommended that Petitioner should not testify because Petitioner had already provided two inconsistent statements to law enforcement officers, and counsel was concerned that Petitioner's trial testimony would amount to yet another inconsistent statement. (Id. at Page ID## 1309-10.) Additionally, Petitioner had thirty-four convictions for forgery and counsel feared that the prosecutor would "beat [Petitioner] over the head with them" during cross-examination. (Id. at Page ID# 1309.) Trial counsel testified that although he recommended that Petitioner not testify, he left the decision up to Petitioner. (Id. at Page ID## 1340-41.) Although Petitioner faulted trial counsel for not preparing him to testify, (Id. at Page ID## 1285-86), he conceded that he advised the trial court under oath that he had decided not to testify and that he had not been coerced to give up his right to testify (Id. at Page ID #1287.)

The state court reasonably determined that trial counsel was not deficient in advising the Petitioner regarding whether or not he should testify. Despite having ample opportunity to do so, Petitioner did nothing to alert the court to his desire to testify. Furthermore, Petitioner testified under oath during the <u>Momon</u> hearing and unequivocally expressed his intention not to testify. Although Petitioner seeks to disavow his decision not to testify, he cannot do so. "[S]olemn declarations in open court carry a strong presumption of verity," <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977), and the Court is entitled to rely on those statements and the testimony of trial counsel. Petitioner has failed to establish that counsel was deficient in connection with Petitioner's decision not to testify.

Even if counsel had been deficient however, Petitioner does not offer any evidence to suggest how his case was prejudiced by his failure to testify. As noted above, there was ample

evidence to convict Petitioner and Petitioner does not suggest how his failing to testify might have altered the outcome of the trial. Petitioner is not entitled to relief on this claim.

### 3. Failure to Call a Witness from the Jail to contradict Brian Smith's Testimony that Petitioner showed him Photographs of the Victim's Body

Petitioner claims that his trial counsel was ineffective for failing to obtain testimony from someone familiar with jail policy to rebut Mr. Smith's testimony that Petitioner showed him pictures of the victim's skeleton. Petitioner contends that jail policy would have prohibited him from keeping pictures depicting the victim's remains however, Petitioner has never produced any evidence of such a policy or a witness who could have testified about such a policy, despite being represented by counsel at the post-conviction hearing. Moreover, trial counsel impeached Mr. Smith by establishing that Mr. Smith had been convicted of a crime of dishonesty (Doc. No. 14-5 at Page ID# 673) and that Mr. Smith was hostile toward Petitioner because of an incident that took place while they were incarcerated together (Id. at Page ID## 674-76.) Trial counsel also attempted to catch Mr. Smith in a lie when he asked whether Petitioner had shown him color pictures or black and white pictures, because trial counsel knew that Petitioner had received only a black and white photocopy of the discovery in his case. (Id. at Page ID# 676.) Trial counsel also obtained the testimony of Mr. Holt, who testified that Mr. Smith did not know anything about Petitioner's case, and Mr. Beersdorf, although his testimony is unknown there is no evidence that Mr. Beersdorf corroborated Mr. Smith's testimony. (See Doc. No. 14-16 at Page ID# 1364.)

Petitioner has failed to demonstrate that counsel was deficient for not obtaining a witness to testify about jail policy regarding prisoners keeping pictures of their victim's and, as such, he has failed to establish entitlement to relief.

**VI    CONCLUSION**

For the foregoing reasons, the habeas corpus petition will be denied and this matter dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  Rule 11, Rules Gov'g § 2254 Cases.  Petitioner may not take an appeal unless a district court judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if Petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A "substantial showing" is made when Petitioner demonstrates that "'reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different matter or that the issues presented were "adequate to deserve encouragement to proceed further.'"  Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000).)

In this case, the issues raised in the petition do not merit further review.  Thus, the Court will deny a COA.  Petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals.  Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE